We begin. Judge Chen has a motion, and I have a motion, so Judge Chen, if you'll make your motion. Thank you, Judge Dyke. Yes, this morning I moved the admission of David J. Rosen, who is a member of the Bar and a good standing with the Highest Court of California. I have knowledge of his credentials and am satisfied that he possesses the necessary qualifications. If I could just speak for a moment, Mr. Rosen has been one of my law clerks for the past year, and it's just been an absolute pleasure to work with him. I'm convinced by his ability to think through problems and help me think more deeply about so many tough issues that he's going to be an asset to the Bar, and I fully expect that he'll be back here someday soon standing at this podium arguing in front of us for all these reasons I've moved for his admission. Your motion is granted, Judge Chen. Thank you. After due deliberation. And we welcome Mr. Rosen to the Bar of this Court and look forward to seeing you standing at the podium in the future. And I get to say that Judge Dyke has a motion. Yes, I would like to move the admission of my law clerk, Sanjeev Prakash Lad, and he is a member of the Bar of the Highest Court of Minnesota, and he's been my clerk for the last year. And I wonder if I can outdo Judge Chen in my praise of Mr. Lad. He's been a pleasure to work with, a great contributor to Chambers, and he's done really outstanding work, and I'm sorry to lose him. And as with Mr. Rosen, I hope and expect that you will appear before this court and I'll have the pleasure of examining you during the whole argument in the near future. The motion is granted, and welcome to the Bar of the Court. We look forward to seeing you. Please stand and raise your right hand. Do you solemnly swear or affirm that you will comport yourself as an attorney and counselor of this court, uprightly and according to law, and that you will support the Constitution of the United States of America? I do. I do. Welcome to the Bar of the United States Court of Appeals for the Federal Circuit. Okay, thank you. That brings us to our first case this morning, which is number 14-1693, Sandoz, Inc. versus Amgen, Inc. Mr. Hurst. May it please the Court, Jim Hurst. Congress specifically takes away that right. That didn't happen here. The law is clear. Unless it produces an absurd result that Congress couldn't possibly have intended, the plain language of a statute is enforced as written. The BPCIA does not bar this lawsuit, not in its plain text for sure. Amgen never argued otherwise below. So Amgen cites three limitations on D.J. actions in this act, none of which apply here. First, each of the limitations on its face applies only to subsection K applicants. Sandoz is not a subsection K applicant. Second, even if we were a subsection K applicant, none of the three provisions prevents the D.J. action here. 9b and 9c are essentially penalty provisions. They prevent the filing of a D.J. if a K applicant fails to comply with a statutory obligation. Sandoz hasn't failed to comply with any statutory obligations, so they don't apply. And subsection A expressly contemplates D.J. actions after notice of commercial marketing. So subsection A applies to a limited subset of patents, which currently does not include the two patents we're talking about and will never include those two patents. But moreover... How do we know that it will never include those two patents? I thought that the universe of patents covered by subparagraph A is pretty broad. The ones that are going to go into 271E litigation and the ones that are not. The eight Subsection A only applies to the ones that don't end up in the 262 litigation. And the K applicant has full control over which patents do end up in that litigation. So these two patents surely will be in the litigation. But secondly, here's what 9a says. It says it applies only, quote, prior to the date notices received under paragraph 8a. That's notice of commercial marketing. Sandoz already gave that notice. So even if it did apply, which it doesn't, it still wouldn't bar a lawsuit. I'm sorry. This has been confusing to me. Can you explain just how the language is? A says, under certain circumstances, neither of the parties gets to file a D.J. action regarding any patent described in clauses one or two of 8b. Right. So one... One and two of 8b. Well, described in those two clauses, but those are... Do you mean that that's the intersection of those two clauses? No. Or the union of those two clauses? 8b relates to the patent that get left out of the litigation. That's what 8b relates to. The patent that get let out of the litigation. So it's included on the product sponsors list, but it doesn't end up in the litigation. So those are leftover patents, essentially. And you read clauses one and two, that phrase, to be the paragraph three list minus the stuff that's taken out on the paragraph four or 5b list, as opposed to any of the patents that comes in under either of those two clauses. For sure. That's how we read it. Yeah. Moreover, even if it could be read differently, Your Honor, this provision contemplates D.J. actions because it says it applies only prior to the date notices received under paragraph 8a. That's just notice of commercial marketing, which we gave, if it applied, but it doesn't. The only way you avoid the plain text is to... How did you give the notice of commercial marketing? We sent a letter before we even filed the lawsuit saying we intend to commercially market upon launch. And that would be all that would be required if this provision applied. But doesn't paragraph 8a contemplate that you've already been licensed under subsection K in order to provide that notice of first commercial marketing? Surely, that was the district court's ruling, and that surely is incorrect in our view. If you were to read that, that you can't give notice until you're licensed, think about the consequences. You get a K applicant. I'm sorry, so this is not a plain meaning argument anymore? No, I think the plain meaning is clear of 8a as well. The question was you can't provide notice until you're licensed. That's what the district court held. Think about that. So 8a, this was the district court's ruling. Under her ruling, a K applicant could get approval from the FDA at the end of the 12-year period of exclusivity. Even if it wins all the patent cases below, there's no more patents left, and yet, according to the district court, you couldn't launch. At that point, once you get FDA approval, you give your notice, and you sit idly with FDA approval in hand for six months for no reason. That's not what the statute says. It says you provide notice, quote, no later than, unquote, 180 days before, and this is the key phrase, the first commercial marketing of the biologic product licensed under subsection K. License qualifies biological product, meaning the product has to be licensed for commercial marketing. It does not say you have to wait for licensing to give notice. You need licensing to commercially market. You don't need licensing to give notice, and if the district court were right, it would absurdly increase the much-debated 12-year period of exclusivity. But the statute is written for the 12-year period and the various restrictions on litigation to be independent of each other. There's no cross-reference. So the fact that in some cases there may be an extra six months, you know, so what? I mean, I know what the answer is. It's practical, but so what? They could have written the statute to say, under no circumstances may there ever be a period of exclusivity longer than the 12 years. They didn't write it that way. No, but the plain reading of this notice provision does not say you have to wait for licensure from the SBA to give notice. It just doesn't say that. All it says is that the market— It does require that the notice be given by an applicant, and you're not that. That's true. So what I'm saying is the statute doesn't apply to us at all. But even if we were a K applicant— I guess what is sometimes called a reticulated remedy regime that says we don't want litigation too early, that you would be able to conduct the litigation the day before filing your application. The next day you couldn't conduct the litigation because all of this would apply. You could the next day. How? Because none of these limitations preclude— No, I'm saying your position is that when Congress said an actual applicant can't file these D.J. actions without going through all of these processes of exchanging information and narrowing lists and so on, a non-applicant, the day before it files, can file the D.J. action. What I'm saying is even an applicant, the day after they file their application, so you're now an applicant, you can still file a D.J. action unless one of those limitations applies. So you have to just apply the limitations as they are written. Right, you have to go through this whole— You don't. You can file a D.J. action the day after you file— Really, without doing any of the information exchanges? Absolutely. Your theory, if I understand correctly, is that this is directed to 271E infringement rather than A infringement. Yeah, moreover, just more broadly, this D.J. actions and 262 actions, they're not mutually exclusive. They can sit comfortably side-by-side. It happens all the time. In fact, when patent owners file patent infringement litigations, often a knee-jerk reaction from the defendant is to file a mirror-image DAC action. Why would Congress create this very carefully and painfully crafted set of patent litigation procedures? It's a good question. Think about the context they were talking in, sir. Because they were contemplating that there would be plenty of time during this 12-year period of exclusivity to deal with all the outstanding patent litigation. So you can leisurely go along and resolve the patent disputes through this patent exchange information. But the idea, the key point was resolve the patent disputes before the 12-year period expires so that price competition can start the next day if the K applicant prevails. In our situation, the 12 years has expired. But your position is you could have, regardless of when the exclusivity period expired, you could have filed a 271A-based D.J. action at any time. And there's no problem with that. Look, say you file a D.J. action four months before you do the patent. There would be a problem, would there not? Because if, in the ordinary course, this were filed four years after the beginning of the exclusivity period, it would seem unlikely that at that point that you would be able to bring an ordinary D.J. action in light of the immediacy test of Medivine, right? Yeah, if you're eight years away from approval, maybe that's getting too far ahead. So maybe you don't have a case or context. As I read the history of this, this was designed, these provisions were designed to enable you to bring to early resolution the question of infringement. And there's a pretty sparse legislative history here. But to the extent that there is legislative history, that seems to be the purpose. No? To create controversies where they might otherwise not exist. So that the infringement issue could be resolved before a market. And so here, they were not eliminating... Look, Congress wasn't artificially delaying the resolution of lawsuits that were otherwise ripe. Why would they do that? They're looking for expedite. Why is this one otherwise ripe when we don't even have an application that precisely defines the product against which we're going to measure infringement? Because the only issue is whether we have the... We're nine years into this process. Just think about the situation. Do you have a precisely defined product that cannot change? Absolutely. How do we know that it cannot change? The sequence doesn't have to be identical to be biosimilar. You may fail the phase three trials and never file the application. Nothing has to be absolutely certain for a D.J. action to proceed forward. Otherwise, you've got the act. We're nine years into this process. We've spent tens of millions of dollars and we are facing commercial delays based on pop-up submarine patents that just surfaced? Your argument is not dependent on the nature of the patents. Assume it's a perfectly good patent. What Judge Toronto is asking you is, isn't there a risk that the product could change here? So if we have a D.J. action, forget about the statutory scheme. Just under the usual standards of Menomine, isn't there a possibility that the product could change during this process so that you would have litigation now that was directed to some product which ultimately isn't going to be approved in the market? Not a realistic possibility. I know biosimilar is new to this court. It's the first case that we have on this. The foundation of biosimilar approval is the preclinical work characterizing the molecule. We are identical to Enbro. After nine years, tens of millions of dollars, even bioequivalent clinical trials with 100 patients, we've passed with flying colors. We are in the last lap of a very long race. There is no realistic possibility that we're going to change this molecule. And no realistic possibility that the Phase 3 trial will fail? No. It's not impossible. Maybe the product won't change, but you may, in fact, discover that the thing folds in a different way or something and it doesn't work. No, we know that. We've characterized that, so we know that. What the FDA has said is that these Phase 3 trials for biosimilars are confirmatory. That's what they are. To confirm what you've already proven. I thought there was something that said the FDA wanted you to go through the Phase 3 trial because there was some uncertainty. No, there's a guidance that says if there's residual uncertainty, you go to Phase 3. We're the first biological application through the FDA. They were never going to waive Phase 3 for the first company coming out of the box. I'm sorry, how is it that we conclude that a process that gathered has, in fact, not run its course in the FDA, even a single time? Do I understand it was just last summer that the very first application under the biosimilar provision was even thought? We're going to conclude that there's basically no substantial uncertainty about the success of your Phase 3 trial and the approval by the FDA. You don't need to make that ruling, Your Honor. The test focuses on reality and immediacy. Reality is, is the product fixed? Yes. Immediacy is, did you engage in meaningful preparation ten years, I mean, nine years? Reality, I don't think, is only that the product is fixed. It's also whether we are certain, whether we're certain enough that there will ever have to be litigation about this. Last two thoughts, because I've got to, I'm running out of time. Don't worry, we have questions. We're going to ask them. We're going to answer them. Let me answer your question directly and give you an example. Two times in Glaxo and Teva, this court found that the filing of an ANDA application was good enough for DJ jurisdiction immediacy-wise. When you file an ANDA, you're looking at approval anywhere from 18 months to three and a half years out. We're in that same time frame. You could have said the same things in those cases. Who knows what the FDA... Wait a minute. First of all, you haven't filed an application. No, but it's different in biosimilars, right? Because in biosimilars... There's more work to be done. We already did the work. Here's biosimilar evaluation. In an ANDA, the first time the FDA sees the drug is when the application is filed. We've been working with the agency since 2010, and they have said the foundation of biosimilar approval is, in fact, the preclinical work, which we passed with flying colors, and we've done more than that. But here's the reality here, equity-wise. If you toss us away, if you close the door to this lawsuit, we will be damaged, the public will be damaged, because if we delay the adjudication of these patents, our product launch will absolutely be delayed well beyond 2016. We will be harmed as a company. The public will be harmed. That's what declaratory judgment jurisdiction is designed to address, precisely this situation. Can you just answer this question? You've asserted non-infringement. To the extent you can tell me, what's the ground for non-infringement? There are certain claims that we wouldn't necessarily infringe, because there are so many claims with so many variations, but Amgen has said nine times publicly that the patents cover Entanarcept. That's what we're going to sell, Entanarcept, the same molecule. So clearly, there's a dispute between the parties about these patents. If you had never filed the DJ action, could Amgen have just sued you for patent infringement? No question about it. By the way, they have in very similar circumstances. Wait, wait, wait. The suit by Amgen for patent infringement would have been a 271E suit and not an A suit, right? No, they could have filed the DEC action just like we did. They did, in fact. Amgen filed a lawsuit against Roche. Yes, they could have filed a declaratory judgment action saying you're planning to market this when it's marketed. But if they're going to sue for infringement, at this point, it would have to be 271E infringement based on the filing of the application, right? Not necessarily, because you don't need to have an act of infringement. They could just say that we're on our way, as an example. Amgen sued Roche. I don't see that. And I think it's damaging to your position to suggest that because the argument, as I understand it, is that this elaborate structure in the statute is dealing with 271E infringement. And to the extent that the statute is talking about infringement suits brought by the patentee, it must be talking about infringement suits under 271E. It is, and I'm just saying it's not the exclusive remedy. My example is going to be this. Amgen's one of the biggest products is called EPO. Roche was coming out with an alternative to EPO, something similar. Amgen filed a lawsuit against Roche 6 months, 6 months, before Roche filed its NDA. And it argued successfully that jurisdiction existed before the NDA was filed. So 271A infringement action, that's purely forward-looking. Purely forward-looking. This is threatened action. It's not... Purely forward-looking. What would it be? Anybody that's in Phase 3? Anybody that's in Phase 2? Where would that be? That the reference product sponsor could go after a would-be but not yet filed case? I think you have to look at it case by case. But I think for biosimilars, by the time you get to Phase 3, you've already cleared every possible... I don't understand what you're talking about. There can't be infringement. There's an artificial act of infringement. They're allowed to bring suit on that. But you can't sell the product until at least it's been approved. So I don't understand how there can be an infringement suit under 271A before the product is actually sold. There's no act of infringement. They couldn't file an infringement action. It's not important to my position, but I would say... It is important to your position. Well, I don't think they could file an infringement action. They could file a declaratory judgment action just like they did against Roach, and they would just have to... Okay, but that's different. That's not an infringement action. Oh, okay. I'm sorry. Then I misunderstood the question. I meant they could file a D.J. action, a D.J. action, just like we filed a D.J. action. Because of the anticipated... That's right. That's right. Exactly right. And get an injunction against it? If they won, eventually, yes. Under the Declaratory Judgment Act? Sure. That happens all the time. Or would that be under the remedial provision that would apply to 271A? I think it depends on how they frame their lawsuit, but they could just file a 271A declaratory judgment action. This is not uncommon for D.J. actions to take place before the actual sale of the product because it's coming. It happens all the time in many industries. You file... Microsoft sees somebody coming out with a competing product and before it hits the market, they file an action before any infringement occurs, and it's called a DEC action, and it happens all the time. And all you have to do is comply with the immediacy and reality requirements. And that's what... We've done that here. This is the kind of case that this Act is designed to address. I am now way into my rebuttal time. So if there's... Just tell me again. I'm sorry. Why did Tom... You don't have a right to sit down. Oh, no, no. You don't have a right to sit down. I'm happy to stand as long as possible. I'm just cognizant of the time. I'm getting a little nervous about it. We'll give you two minutes for rebuttal. Don't worry about it. Thank you, Chuck. Tell me again. Why did Congress create, you know, L, subsection L, and all these complicated patent litigation provisions? I mean, I guess you're saying we can sort of just put that to the side. If people want to play with subsection L, they can play with subsection L, but at the same time, there's this completely free-form parallel track where they can invoke a notion of 271A... No, Judge Cheney, it wasn't purposeless at all, because think about the situation they were facing. They're facing lawsuits in the 4- to 12-year period, and at that point in time, you're not likely to have a case or controversy. So they created a case or controversy. For instance... I'm sorry. Would you not have it in year 10 or 11? As you get... Look, here's... Why do we have it here? Because if Amgen had remained silent... Look, the patentee has to take an affirmative act, right, to create a case or controversy. If the patentee doesn't take any affirmative act like Amgen did here with its 12 press releases and industry-wide proclamations, there would be no case or controversy. So this patent exchange process, which during the exclusivity period can proceed at a leisurely pace... And the artificial act of infringement. It creates an artificial act of infringement, so you could actually have early lawsuits. That's why they created it, so you could have early lawsuits long before the 12 years expires, long before approval, and you can resolve all the patent issues. We are in a completely different circumstance. The 12-year period has expired. We have a case or controversy because Amgen created a case or controversy very pointedly, and we have a situation where after 9 years and tens of millions of dollars, we are facing the dilemma, the scarecrow patent dilemma, that the D.J. Action is designed to address. And so, look, the Act itself doesn't bar the doors. I go back to my original point. If you read the plain text, and the plain text does not stop this lawsuit, you just move on, and I don't think it or even arguably creates absurd results, I don't think, because we are carrying out the purpose of the Act by trying to expedite price competition. Then you just move to your standard D.J. analysis. That's what you should do. In some cases, the action might fail. In some cases, it will succeed under the normal D.J. analysis. But in this case, we think that it succeeds. Okay. Thank you, Your Honor. You can sit down now. We'll give you two minutes for rebuttal. Mr. Predican? May it please the Court. The district court decision was based on two separate and independent grounds, as you are well aware. But as to the statute, I mean, we're dealing here with a situation in which we don't have that much legislative history, as I understand it, but no committee reports on the statute. There's actually little, if any, floor debate about it. Do you agree that the purpose of these provisions and the creation of the Artificial Act of Infringement, as was said during the legislative history, that the purpose of that was to enable the resolution of the patent dispute before the time of commercial marketing? Well, I agree, Judge Dyke. There's very little legislative history on it. You are absolutely correct on that. I think there were a variety of goals that were being achieved in this statute. Was the one that I mentioned one of them all? Not necessarily, no. I don't think that that's clear from the legislative history. I think the goal here was to create an orderly process for the resolution of patent disputes involving biologics. That was the goal. And what the Congress was doing was balancing a lot of interests here. In part, there was a desire to speed the approval of biologics, the similars, the biosimilars. No question about that. But all you have to do is look at the name of the statute, which also talks about innovation. Well, I understand, but the question is, was one of the purposes of the statute, and this structure that we're dealing with here, designed to permit the resolution of patent disputes before commercial marketing? The goal was to try to do it quickly. Whether it would coincide exactly with the date when the biosimilar applicant is otherwise ready to go to market or not, those things are very difficult to time precisely. You don't do that with Hatch-Waxman. And they didn't do it here. What they tried to do was to create an efficient and orderly process, and it can move very quickly. Okay, so one of the goals was to get early resolution of patent disputes. Sure. Okay? Sure. All right. So why wouldn't one construe these provisions here as directed to 271E infringement, the act of infringement that's talked about when the patentee is required to, or the first biologic is required to sue, has to refer to 271E infringement, right? When we're talking about A and B actions for infringement, that has to be 271E infringement, right? The statute is not limited to 271E infringement. No, no, but you're giving a general answer to a specific question. I'm asking about 6A and 6B. The infringement actions that are referred to there have to be 271E infringement actions, right? I think what the statute contemplates is that... No, but what's the answer? Are those provisions referring to infringement actions based on 271E? I don't think it's limited to that. I think prohibition... How could there be an infringement action that wasn't a 271E infringement action before the product itself? It's highly unlikely that that would ever happen. I agree with that. 271E is created to move up the date when one can litigate the issue of infringement. There would be no A. It just doesn't happen. E is something... It was sort of in the case Mr. Hurst referred to about 6 months before Roche was coming in with something. There was an injunctive action that was not a 271E action. It's just like... I mean, you don't need a special statute to go into court when there's a genuinely threatened action and get an injunction against it. It is possible that one could have a 271A case before a product is marketed. I don't dispute that. But what Congress did in the BP CIA was to occupy the field and to prescribe the way patent litigation relating to the biosimilars is to be conducted. How would allowing this suit in a very concrete way interfere with what is either... Let's use the word contemplated as something slightly broader than specifically sentence-by-sentence said about this whole elaborate multi-stage process that this statute sets up? It really would undercut the statute in a variety of ways, Judge Duranto. There are anomalies and inconsistencies that would occur if you have this parallel universe that they're describing where you could have declaratory judgment actions separate and independent from the scheme that's in the statute. So let me try to give you some concrete examples to address that. First, with respect to the biosimilar that is being the subject of the application, the BP CIA gives the reference product sponsor the right to select the venue. This is part of the congressional policy. It's clear and unequivocal. It's an important right that is given to the reference product sponsor. If we accept the notion that they could jump the gun and file a DJ action one day, before filing their application in order to game the system, it totally undercuts and defeats that provision of the BP CIA. Now that's one example, and it's an important example of selecting the venue. Second, the BP CIA contains a whole subsection that directs when declaratory judgment actions can proceed and when they can't proceed. It covers both contingencies. If you file, if you comply, if you don't comply, it covers everything and prescribes when they may proceed and when they may not. I guess a version of my question is, explain that in a concrete way. Sure. What would be the harm done to what Congress had in mind in creating this regime by allowing this suit to go forward, assuming that it otherwise met the anti-prematurity, anti-contingency conditions of normal... That's a big assumption, of course. Yes, I recognize that. Sure. So let's assume, hypothetically, that there was a pending DJ action. They seem to concede that once they actually make their filing of their BLA with the FDA, that these statutory restrictions are going to kick in and limit what DJ actions can be brought. If you read those provisions... I don't think that's true. I think they're saying that it limits 271E DJ actions, not 271A actions. But go ahead. All right. Not entirely clear to me from reading their briefs. You may be right, Judge Dike, that that's their argument. There are some broader statements in some of the briefs on that, but be that as it may, that's an exception that would swallow the rule if one could simply skirt all of this by saying what I have is a 271A action and not a 271E action. Again, you could... Well, you can't skirt the rule eight years in advance because you probably couldn't satisfy the 271A requirements. You could defeat all... And we've all agreed that the purpose of 271A infringement provisions is to accelerate the ability to litigate the patent dispute. You would defeat the provisions, for example, on all of the exchange of information. What the statute requires is there's a process there where they have to provide information on the product, they have to provide information on the process they're going to use to make the product. All of this information comes out and can be taken into account in the negotiations back and forth over to which patents are going to be asserted and to prioritize the assertion of those patents. It's a process that Congress created. What they would have is a free-for-all. They call it a 271A case. They file it one day before they file their application with the FDA, and now they say we can proceed with this lawsuit. It would be in tension with the provisions that are in the statute. They now have picked the venue for the action. The statute would seem to say that the action needs to be dismissed. Are we going to have two parallel lawsuits? Are we going to have a 271A DJ filed one day before the application was filed, and then we're going to have another lawsuit that follows the procedures? I think the concept is that the statute generally was designed to allow a very early resolution of patent disputes. They can file an application four years into the exclusivity period, and that gives eight years for FDA approval and for the litigation. Everything works very well. The problem is when you get to a situation like this where the exclusivity period has expired before the statute is even enacted, how do you deal with it? That's what we're struggling with. It's not clear that Congress really thought about that situation or intended to deal with it, and that gets back to the question of why would allowing a 271A suit, if it qualifies under the metamutant standards, to proceed under these kinds of circumstances? It's not, other than the choice of venue, I'm not sure that you've identified any adverse effect from that. Well, I think if you read the sections, the declaratory judgment sections of the statute, I think they might very well require dismissal of that action once those are triggered, because they say they cannot bring the DJ action. The thing that troubles me is if you look at 2201, which is the declaratory judgment provision, and you see that there are various exceptions listed in there, the exceptions putting aside the biologic statute and the Hatch-Waxman, which aren't written in to the 2201 as exceptions, but if you look at the exceptions to 2201, they're always stated in terms of the nature of the controversy, rather than the party bringing it, and Congress didn't do that in the biologic statute. They didn't say a controversy with respect to whether this biologic infringes the patent, can't be the subject of a declaratory judgment action. Instead of following that course, they chose instead to identify the person who can't bring it as the k-applicant, which perhaps suggests that the k-applicant is someone who has committed this artificial act of infringement, and that that's the context of what they were thinking about. I think they are a k-applicant for purposes of this case, Your Honor, and I think that's an important point, and let me address that, and I think that does bring them squarely within the reach of the statute. And that's if subparagraph A prohibits DJs by both sides. Yes. Okay. It works both ways. The statute does, subsection L1A says that a subsection k-applicant is a person who submits a subsection k-application, and Congress used the present tense. They didn't use the past tense. Now, when one reads the context of the statute, it makes sense that someone who is in their position would be treated as a subsection k-applicant. But they are not a k-applicant now, right? That's... They're seeking a declaration of rights as... No, but they are not a k-applicant at this moment. For purposes of the declaratory judgment action, they are. How so? A declaratory judgment action, by its nature, is forward-looking. It assumes facts that are going to occur in the future. They are not an infringer, but they're seeking a declaration of their rights under the patent as if they were an infringer. When I bring a DJ action and say that I don't owe you money on the contract, I don't have to pay, it's forward-looking. That's inherent in a declaratory judgment action. And what they've brought here is a declaratory judgment action that seeks a declaration of their rights as a subsection k-applicant. I think what you're pointing out is that there are a lot simpler ways of drafting this statute to accomplish what you say it should accomplish, which would be to say a controversy between someone who is or may in the future be a k-applicant, is barred. I mean, there's just lots of easy ways to write this, which they didn't choose to do. In construing the statute, you have to look at the context and the purpose of the statute. Congress almost never, unfortunately, writes these statutes with the clarity that we as lawyers, looking back a few years later, might have been able to employ when we were doing it. But there is clear... We can all agree on that. And there is clear evidence here that what Congress intended to do was to occupy this field and to regulate the way that patent disputes involving biosimilars are going to be handled by the courts. One seldom sees a scheme as detailed, as reticulated as this scheme, that one would regard as optional or voluntary or that could be sidestepped by the expedient of filing your lawsuit a day before you submit the application. It just doesn't make sense. Congress amended 271E to manufacture infringement when someone files one of these subsection K applications, right? Yes. So is that the same thing that Congress essentially felt like it had to manufacture a controversy between the reference product sponsor and the biosimilar applicants at this early stage when they essentially moved back in time what could be regarded as a controversy? I think that's right. They were concerned that maybe you wouldn't have a controversy at that early stage. I think that's right. I think that's what they did with Hatch-Waxman too. It's a way of looking back at a time when there would not be 271A infringement either way but allowing the issue to be litigated so you create the artificial act of infringement. I think that's what Congress was doing here in order to allow these cases to proceed. But coming back to my point, Your Honor, on the question of whether they are a subsection K applicant, they really want to have it both ways. Fundamentally, that's their position. For purposes of immediacy and reality, they're coming in and they're telling the court, look, we're... Just paperwork left. Just paperwork left. That's their position. Everybody knows exactly what the molecule is. Everybody knows it's going to be approved. It's just a question of time. We barely even need to write it down. But the essence of it is that they're a subsection K applicant. That's the sine qua non. That's how they try to satisfy the issue, the problem of immediacy and reality. And so when they're talking about immediacy and reality, sure, we're a subsection K applicant. But then when we get over to talking about the BPCIA, suddenly they say they're not. The truth of the matter is, they are seeking a declaration of their rights as a subsection K applicant and should be subject to the statutory scheme. I guess I... Can I just ask you again? I'm... Maybe I'm just being dense, but aside from venue choice, which conceivably might be a sufficient congressional policy that you could move for change of venue, I don't know whether that would be. Permissible. But put that aside, I'm still not grasping in a concrete way. Let's assume they really were an applicant. Then again, what is the harm to what Congress, concrete harm to what Congress said ought to happen to the interests of the parties, to the innovation side and the price competition side of allowing this to proceed? Well, one can look, for example, at Section K6 of the statute which governs interchangeables. That's a very special type of biosimilar. It's one that qualifies at a higher status. What you'll see when you read through that is that there are various exclusivities that the first interchangeable gets and the periods during which that exclusivity continues are triggered and keyed off the L6 litigation that's prescribed in the statute. So those are pretty important and those affect the interests of the public and the rights of other potential makers of biosimilars down the road. Can you just clarify, do we know one way or the other either because it's generally the case under the statute or something about this particular plan on Sandosa's Park whether interchangeability will be at issue with respect to the product they want to get approval for? We don't know at this point what they're trying to do but it's a reason why Congress has tied all of this to the litigation that has to unfold according to the plan and the scheme that's laid out in the statute. The way the statute is written, if they satisfy biosimilar, do they get approval without regard to any interchangeability? They could. That's another option but it's not something that the FDA has to apply to. But there's a benefit to being regarded as an interchangeable. Enormous benefits that flow from that and the exclusivity and Congress has tied that to the L6 litigation. And we don't know whether they're going to seek those benefits. We don't. But it's another indication that what Congress has done is to provide a scheme here which is highly interdependent. You can't just take little pieces of it apart and to allow the litigation to proceed independent of that in this parallel universe really threatens to disrupt the scheme that Congress has crafted. Putting completely to one side now this statute, what are the best arguments you have for why there is undue prematurity in traditional either case or controversy or declaratory judgment remedial standards? Sure. And I think it's pretty well laid out in the briefs. But to highlight a couple of the key points, Your Honor, first we know they haven't submitted the BLA. So the product really isn't defined. And there's nary a case out there where a court has allowed and found a D.J. action to be right, to be a case for controversy prior to the filing of the application with Food and Drug Administration because that at least gives you a target that you're aiming at. Nary a case? None. None. None. None. Zero. No, no. And not just biologics. This is true of devices. It's true of pharmaceuticals. None. What are the chances that they would change the product? I think it depends on what happens in these phase three clinical trials. And that's a very important point. One doesn't know what's going to happen in those phase three clinical trials. What we do know is that the FDA could have dispensed with those clinical trials and didn't. Also, one of the statements I was struck by that was made by counsel in the argument this morning is that structurally what they have is identical to Etanercept. But, you know, if you actually look at the language that they put in the declaration that they submitted, it's in the appendix of 2053, what you'll find is as they go through all these analytical tests that they did, there were some things they say are identical and some things they say are highly similar. Which is a red flag and maybe the reason that the Food and Drug Administration required that these phase three clinical tests be done. Does your client, Amgen, get to comment on the FDA approval process? No. Is there any question that if they get approval of this product that's in the clinical trials that you will seek to bar them from marketing it because of patent infringement? We don't know for sure at this point, Your Honor. A couple of points in that regard. You're not sure that you would sue them? Not sure. First, they've said, they've asserted non-infringement defenses and we have limited visibility into what they have and what they do. Under the BPCIA, one of the things you get in this exchange is, for example, process information. We haven't seen that. We don't know what's there. We have a number of patents. Are you saying that there's a greater doubt as to whether you would sue them on any of the patents? If we believed that we had a basis for asserting infringement claims under our patents and they get approval, sure, we're going to sue them on those. But at this juncture, we have limited visibility. We don't know anything about the process. One of these two patents is a... Well, not all the claims, not all the patents are directed to process. One of them is a process patent? Yes, but others are not. Right. The other one claims the structure, the fusion protein. They said they don't infringe. And there are other limitations in those claims. So, you know, is it likely? Sure, we have an important product here and we have patents. But that's the reason this process exists in the statute for the exchange of information. Once one of these FDA applications gets filed, can it be amended by the applicant? Kind of like how a patent application after it's filed can be amended? I'm not sure I know the answer to that, Your Honor. I mean, certainly as you go through, you file the application with the FDA. Could they amend it? I don't think that they could amend it to change the structure or the composition that is the subject of the application without essentially rewinding and starting over. But maybe use limitations or things like that. Perhaps. Perhaps in labels and negotiations. Well, yes, those sorts of things might be what they're seeking. Sure. My understanding is you didn't raise the statutory argument in the district court. Is that correct? We did raise the statutory argument in the district court, Your Honor. What we raised in our opening brief, we said that the BPCIA is instructive because it points to the limitations that are in effect here. But keep in mind, they were... Could you argue that the statute was a bar to the sanction? No, they were a little cute. No, you did not. We did not, no. And they were a little cute in the opening papers. They said they were going to market what they called a biosimilar. We didn't know at that point whether what they were going to do was to pursue the A pathway or the K pathway. The statute wouldn't apply if they followed the A pathway? No. It would not? It would not. And it wasn't entirely clear what they were going to do based on the complaint. I mean, that's all we had at that stage. We filed our papers. We certainly flagged the statute in the event they were going to pursue the K pathway, but it wasn't entirely clear. They then filed an opposition. They filed declarations. We took some depositions. By the time this was briefed and decided by the district court, there was no doubt that they were following the K pathway. They made that clear in the papers that they filed. It was clear in the declarations and in the testimony. And as I said, they embraced it because they thought that helped them on their immediacy and reality arguments that they were going down the K pathway. And so that, I come back to where I was a few minutes ago, that puts them in a position of wanting to have it both ways. We're a K applicant and that helps show immediacy and reality, but don't treat us like a K applicant  even though we're seeking a declaration of our rights as a K applicant. That's the anomaly in their position, fundamental inconsistency in what they're arguing. Sandoz was mentioning earlier, maybe an hour ago, that at this point, once they get their application in, it'll be ministerial because the FDA has been working hand-in-hand with Sandoz to generate all the information that it needs. And once it files the application, it's almost ministerial for them to get the license. What is your understanding of what the approval and review process is once an application is filed? Well, first, this is the first, the very first time that someone is going to be seeking approval as a K applicant. I think they'd file on some other product, but this is a very new development. So we're in some uncharted waters as to how the FDA is going to be handling this. The record includes the various guidance documents that have been put out by FDA, and I think the things that stand out from this are, first, FDA could have dispensed with the Phase III clinical tests, and they didn't. And one doesn't know what's going to happen in an experiment until you run the experiment and see, and that's why FDA required it. There are differences between that molecule and Acanteracept. That's why they call these things highly similar. And how that's going to play out in afflicted patients, no one knows. The drug had never ever, ever, ever at the time they filed this complaint been tested in an afflicted patient. Ever. Second, they admitted, their witnesses admitted, that Phase III clinical trial results cannot be predicted based on analytical data and on the Phase I results. So, what we know, what the objective evidence shows, what the district court found, and this was within the province of the district court to make these findings, was that we don't know. That it's speculative at this point and that's why we're not at a stage where a declaratory judgment action presents the immediacy and reality that's required. Would it present the immediacy and reality when the Phase III trials are completed? It's not the facts that we have here. Leaving aside the BPCIA, if one had completed Phase III clinical trials, you certainly would have another point of reference. It still seems to me that the filing of the application with the FDA is a very, very important milestone as the cases decided by this court have recognized. It's a milestone for a number of reasons. First, it does fix the product. It's not a moving target. There is a target. It is the product on which they're formally seeking FDA approval. And typically, if the Phase III clinical trials are successful, this is not going to be a huge gap in time, and there's good reason to require that. In general, one would wait, but it would depend on all the facts and circumstances. I can't give you a yes or no answer to that, Your Honor, as to whether or not that would be enough. I think you'd want to look at all the facts and circumstances, but that's not what we have here, and we're not even close to that. Okay. Anything else? Okay. Thank you, Mr. Pritikin. Mr. Hurst, you have two minutes. Thank you, Your Honors. As part of your rebuttal, would you address the point that Mr. Pritikin made about the things seen off the Paragraph 6 infringement suit? I apologize. I didn't catch that. Mr. Pritikin made a point about Paragraph 6, the infringement suits provided there, and things keying off that. This was in response to the inquiry about what would be the harm of allowing this suit. Right. Interchangeability in particular. Yeah. Interchangeability. Of our product with their product? There are statutory provisions, Paragraph 6, I think it's under K, that create different exclusivity periods for certain approvals based not either alone or at all on biosimilarity, but on interchangeability. And I think his suggestion was that, A, we don't even know if you're going to seek to establish interchangeability to get those extra benefits, and in any event, this is a statutory connection between the L sequencing as to patent litigation and waiting until you know exactly what the application is and what the standard is that's going to be applied. Yeah. I actually don't know the question about which exclusivities will be applied and whether we're actually going to be seeking an interchangeability finding. I just don't know at this point. Maybe the company does, but I don't have that information. I apologize. Well, I think the question is not so much what your plans are, but he's saying that this provision and the interchangeability provision suggests that this is applicable to a 271A infringement action. It's not limited to 271E, and I'm not sure that I fully understand the point. Yeah, I think the whole K provision is about actions under 271E, and therefore, the declaratory judgment limitations under A, B, and C are limiting declaratory judgments under 271E. Yeah, and what he's suggesting, as I understand it, is that if you allow a 271A declaratory judgment action, that it somehow messes up the congressionally contemplated procedure to be followed with respect to approvals, and I was hoping that you would be able to shed some light on that. See, I don't see that at all. So the question that was put to counsel is, so what damage will result from having a declaratory judgment action sitting side-by-side with an action under 271E? And the answer is, there is no damage. The one thing that he identified was, well, don't you defeat the patent information exchange process? The answer is no. We'll have our declaratory judgment action. He identified one other thing. The first thing he identified. Yeah, the venue. So I'm going to address both. I was going to address both. So the first one was the patent exchange information. Through the declaratory judgment action, we might disclose that information early, but when we get to the process in 271E, we will go through the patent exchange process so they can sit perfectly comfortably side-by-side. That's number one. No damage at all. Second, the forum shopping issue. The question is, what does the plain text bar? If, in fact, there was gamesmanship going on, that's a perfectly appropriate reason for a district judge to transfer a DJ action file a day early, or even dismiss for discretionary reasons. But that doesn't argue in favor of the text barring the lawsuit. In fact, the plain text, when you read it, each of those provisions, even if we were a K applicant, even if we were a K applicant, neither A, B, or C would bar this declaratory judgment action. One way we know that is that Amgen Below never... You asked the question, Judge. Amgen Below never argued that the text of this act barred our lawsuit. Counsel's response was, well, we didn't know that they were proceeding under K. We identified that we were proceeding with a biosimilar. That is K, number one. Number two, we had depositions. They were fully aware of what our plans were during the briefing, and after we identified that we were pursuing a K application, never once did Amgen say the text of this statute barred our lawsuit, and that's because it just doesn't. It does not. So you go to your traditional declaratory judgment analysis, and I'm judging by the questions that I need to address this issue. The certainty. How much certainty is required before you can open the courthouse doors to a declaratory judgment action? It doesn't have to be absolute certainty. If it was, the Glaxo case would have come out differently and the Teva case would have come out differently. In those cases, and as were filed, approval was anywhere from 18 years to three and a half years out. Of course things could go wrong. Right. In the Enda cases, the court has traditionally used the application as sufficiently fixing things. You don't have that. No, no, no. Why is what you have a sufficient fixing? We don't have a fixed issue here. We don't have a fixing issue here, Your Honor. We just don't have that issue. After nine years of characterizing this molecule, we're identical on an amino acid by amino acid basis. We're not changing this molecule. It's not going to be changed. We don't have a fixed issue. I thought your issue was more along the lines of who knows how Phase 3 will come out. Look, here's what you have to look at. This is why the case is focused on meaningful preparation. It's enough. We have enough confidence that we're going to succeed that we've devoted nine years and tens of millions of dollars to this project. That alone should tell you that there's sufficient certainty to clear the way so that we can get to market when the FDA approves. Are you marketing this already in Europe? Is that right? No, not this product. We are marketing other biosimilars in Europe. Not this one? Not this one. By the way, each of the Phase 3 trials we're experienced in. This is our fourth go-around. Our first three, the preclinical characterization did the trick. The Phase 3 trials confirmed what we had already proven through the preclinical characterization. I'm going to give you two record sites. A1572 and A1592. There is no rigid rule that you have to file an FDA application to create declaratory judgment jurisdiction as Amgen proved when they sued Roche six months before Roche filed a new drug, a brand new molecule application. But if you look at those two sites, they explain the biosimilar process and how you get approved. What they're explaining is one of the sites says the foundation for biosimilar approval is the preclinical characterization. We passed that with flying colors. And the second site... The word foundation leaves more questions unanswered than answered. Well, if you read the... Sometimes you need seven stories on top of the foundation. Yes. Reading the paragraph and combined with this next one, the FDA has said that the Phase 3 trials for biosimilars are going to be merely confirmatory. We've already proven that our molecule is their molecule. We've proven that. In ANDA cases, you don't even have to run Phase 3 trials. The only reason they do it in biosimilars is you might not always have to do it. And here, the first time through, they're asking us to do it, so we're doing it. It's really... Nothing is left but the paperwork and confirmatory studies. That's all. Can I just ask... I asked you this question before, and it's very specific. You say in your complaint that Sandoz contends that the 182 and 522 patents do not cover the product. So that's an assertion that would include, among other things, that Claim 1 of the 182 does not cover. Can you give me some understanding of what aspect of Claim 1, which is the independent protein claim, not the method claims, you think might not be covered? Might not cover your... I would say it this way. Your Honor, I can't tell you today exactly what our non-infringement positions may be, and it will depend on the claim construction. I can tell you this. If Amgen is right, what they said to the public in their industry-wide proclamations that their patents cover in TANRCEPT, then we infringe. But you don't have to stipulate to infringement to get yourself in the door for a dejection. All you have to have is a controversy. They say their patent covers it. I'm not asking about what you had to say. I'm asking about what you did say. Honestly, I don't have a claim-by-claim analysis. I just don't have it. I do know this, though. All I can say to you, Your Honor, is if Amgen is correct that the patent covers in TANRCEPT, then we would infringe. I can tell you that. Thank you, Your Honors. Thank you. Thank both counsel. The case is submitted.